# LYMAN T. RANSTEAD vs. JOHN H. ALLEN.

*Cancellation of Lease Executed in Consequence of Misrepresentation—Proof of False Representation Must be Clear.*

The cancellation of an executed contract is an exertion of extraordinary power of a Court of Equity. The power ought not to be exercised except in a clear case and never for alleged false representations unless it be certainly proved that they were made and were false and that the complainant has been thereby deceived and injured.

Plaintiff leased a wharf from the defendant for three years by a written agreement and entered into possession. He afterwards abandoned the property and filed a bill asking for the cancellation of the lease and an injunction restraining the defendant from proceeding to collect the rent upon the ground that before the execution of the lease defendant falsely represented to plaintiff that there was a depth of seventeen feet of water at the wharf, whereas in fact there was so much less water there as to render the wharf unfit for plaintiff's purposes, and that plaintiff executed the lease in consequence of his reliance upon the defendant's representations. *Held*, upon the facts, that these allegations of the bill were not sustained by the evidence and that plaintiff was not entitled to the relief asked for.

Appeal from a decree of the Circuit Court of Baltimore City (DENNIS, J.), cancelling the lease referred to in the opinion of the Court.

The cause was argued before McSHERRY, C. J., FOWLER, PAGE, BOYD and RUSSUM, JJ.

*J. Alexander Preston* and *Alexander Preston* (with whom was *Robert Ludlow Preston* on the brief), for the appellant.

*Joseph B. Seth* (with whom was *H. E. Mann* on the brief), for the appellee.

BOYD, J., delivered the opinion of the Court.

The appellee filed a bill against the appellant in the Circuit Court of Baltimore City to have a lease therein referred

to cancelled and to enjoin the defendant from prosecuting any suits or proceedings to collect rent claimed to be due under the lease. It is admitted that it was duly executed and by it the appellant leased to the appellee, for the period of three years from April first, 1895, a wharf property in the city of Baltimore, on Bush street dock, at a rental of $600 per annum, payable in monthly instalments, which the lessee covenanted to pay. The bill alleges that the plaintiff told the defendant he desired to engage in the lumber, coal and wood business and his attention had been directed to this property; that he " asked said Lyman T. Ranstead what depth of water there was at said wharf; that said Lyman T. Ranstead replied that there was seventeen feet of water, and that the city guaranteed seventeen feet; that your orator then said that fourteen feet would be sufficient for him and his purposes, but he did not want less; that upon the assurance of said Lyman T. Ranstead that there was seventeen feet of water at said wharf, and that your orator could rely upon that depth, your orator agreed to lease the said property." It also charges that the plaintiff was induced to make the lease by the fraudulent representations of the defendant as to the depth of the water, and that there was less than fourteen feet; that about the last of April he ordered two vessels loaded with wood and lumber to unload, but they were unable to get to the wharf, although drawing not over six and one-half feet of water, and he was finally compelled to abandon the property, as it was unfit for his business. An injunction was issued and after the defendant answered denying that he had made the representations relied on, testimony was taken and the injunction made perpetual by the decree of the Court below. From that decree the appeal was taken.

The conversation in which the alleged misrepresentations were made occurred in the month of January, 1895. The appellee testified that at the suggestion of C. B. Riggin he went to the property where he met Mr. Ranstead's manager, or agent, who showed them around the wharf. After look-

ing over the place he, in company with Mr. Riggin and Mr. Gorsuch, went to Mr. Ranstead's office and what there occurred is stated by him as follows: "After stating for what purpose I wanted to rent the property, I stated to Mr. Ranstead that I thought the place would suit me if there was a proper depth of water, and inquiring of Mr. Ranstead the depth of water in the stream or dock (I don't know what you call it), he told me it was a guaranteed depth of 17 feet." He said he told Mr. Ranstead that he "couldn't do on less than twelve feet of water." In that interview he did not say whether he would take the property or not, but in March he moved to Baltimore from Virginia, his former home, and called on Mr. Ranstead again about the property and it resulted in the execution of the lease of April 1st, 1895. Mr. Riggin said he introduced Mr. Allen to Mr. Ranstead, and "then they entered into conversation in regard to the wharf and mill, etc., and if my recollection serves me right Mr. Ranstead said there was a guarantee of 17 feet of water at that dock. That is as far as I can recollect." Mr. Gorsuch said he was present "when Mr. Allen went to rent the wharf, or the wood yard, as they called it. Mr. Ranstead told him there was 17 feet of water there. That's about the most of it that I know or that I remember."

These were all the witnesses that the plaintiff produced to prove what the defendant said on that occasion. Mr. Ranstead himself denied that anything was said about the depth of the water, but in a letter from him to the plaintiff, dated May 16th, 1895, in answer to one requesting him to release the plaintiff from the contract, he says, " and further, as I advised you (in the presence of a third party), before you made the lease, the city of Baltimore is under special contract to dredge and maintain 17 feet of water in the entire Bush st. dock," which shows that something must have been said about it in the interview above mentioned. That was the only time the depth of water was referred to between the parties. If the testimony of the appellee and

Mr. Riggin be accepted as correct as to what was said on the subject, there is a manifest discrepancy between it and the allegations of the bill which allege that Mr. Ranstead said "there was seventeen feet of water and that the city guaranteed seventeen feet." It is true, Mr. Gorsuch testified that Mr. Ranstead said "there was 17 feet of water there," but that is not what the plaintiff and Mr. Riggin said and their statements are in accord with the letter of the defendant, which the plaintiff offered in evidence. It is contended that the evidence of the three witnesses is in substance to the same effect, but when tested in the light of the actual facts, there is a material difference. There is in the record an agreement between Lyman T. Ranstead and others of the one part, and the Mayor and City Council of Baltimore on the other part, wherein the city agreed, in consideration of the right-of-way for a sewer on Bush street and the right to discharge said sewer into the Bush street dock, "that after the construction of said sewer it will dredge and at all times thereafter keep dredged out said dock, so that the depth of water in all portions thereof at low tide shall be at least sixteen feet. This sewer was constructed and caused trouble in the summer of 1895, according to the evidence of Mr. Fahey, who was in possession of a wharf, adjoining the one leased to Mr. Allen, and the city authorities dredged the dock in July of that year—a few months after the appellee abandoned the contract. The appellant denies that he ever said there was seventeen feet of water in the dock, and further said that he never knew seventeen feet to be in it. As the appellee swears that he told him he could not do with less than twelve feet of water and stated in his bill that he told the defendant that fourteen feet would be sufficient for his purposes, it is not probable that the appellant intended to guarantee seventeen feet to induce the appellee to take the property, as it was five feet more than he required. If the appellant did say there was a guaranteed depth of seventeen feet, the only error that he made was in saying *seventeen* instead of *sixteen*, for it will be

seen above that the city had covenanted to keep the dock
dredged out at all times, after the sewer was constructed, so
that the depth of water in all portions thereof at low tide
should be at least sixteen feet.    Just when the city sewer
was completed is not clear, but it must have been in the
early part of 1895.    In the letter of May 16th, 1895, the
appellant wrote to the appellee that he had been informed
by the city authorities that the money had been appropri-
ated and the contract given out to dredge the dock, and it
was dredged in July.    Mr. Fahey, who occupied the wharf
nearest the mouth of the sewer, said it was commenced
about two years before he testified (May, 1896), and the
depth in front of his wharf was very much lessened during
the construction of the sewer, but the trouble in getting
vessels to his wharf did not exist until the summer of 1895.
As to the difference between sixteen and seventeen feet that
might be accounted for by the fact that the contract with
the city called for a depth of sixteen feet at low tide, which
in ordinary water would be more, but it is not pretended
that the appellee suffered by reason of the difference of that
foot, but on the contrary his testimony showed that he only
wanted about twelve feet.    From the evidence we cannot
feel assured that there was any representation as to the
depth of the water, beyond the reference to the covenant,
or guarantee as the witnesses may have called it, of the
city.    It is not of the character of testimony that would
justify a Court of Equity in undoing that which was done,
by parties perfectly competent to act for themselves, in one
of the most solemn ways known to our laws, contracting
under their hands and seals.    It is an exercise of power
fraught with much danger, unless guarded with an ever
zealous care to see that there is no uncertainty about the
evidence relied on.    This Court has in several cases adopted
the language of the Supreme Court of the United States in
the case of *Atlantic Delaine Company* v. *James,* 94 U. S.
207, on this subject, " that cancelling an executed contract
is an exertion of the most extraordinary power of a Court

of Equity. The power ought not to be exercised except in a clear case, and never for alleged fraud, unless the fraud be made clearly to appear, never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been deceived and injured thereby." The evidence in this case falls far short of that standard.

Whilst it is true that there was not a depth of seventeen feet, it cannot be said with certainty there was not a depth of twelve or more feet when the conversation took place between the parties in January. It is conceded that nothing was said about the depth of water after that interview, when the appellee left without renting the property, and the contract now sought to be cancelled was not made for two months or more afterwards. If the appellee required more water than other people engaged in the same business on that dock did, it is somewhat remarkable that he would rely on such a statement as he attributes to the appellant instead of making inquiries of other people who were using the dock, or by satisfying himself of the depth, which the evidence shows could have been done by measurement in a few minutes. When he was first at the property the agent of the appellant was with him as well as Mr. Riggin, who commanded a sailing vessel, but no effort seems to have been made by him to ascertain the depth of the water then or at any time before the lease was made. If so much depended on the depth of the water, and if that was the inducement leading him to rent the property, it is strange he did not take the precaution to have the guarantee put in the lease. But he not only did not do that, but apparently did not even mention the subject at or about the time the lease was made. His total failure to ascertain the facts about the water, which were so easily accessible to him, and his apparent disregard of his own interests, do not appeal very strongly to a Court of Equity to help him out of what he went into, not hastily, but after ample time for mature deliberation and full inquiry. If it be true that this wharf was unsuited to his business, it is of course unfortu-

nate, but he might have easily guarded against any loss on that account by taking the property for a month or some short time as he had the opportunity to do, or by a suitable clause in the lease. The evidence is conflicting as to the difficulty in getting the vessels to the wharf, which the appellee did unload. There were only four of them, two in April and two in May. Messrs. Lewis & Pearson in charge of a tug boat, testified that they towed the four boats to the wharf and had no unusual difficulty in doing so. They are confirmed by Mr. Christian, the agent of the appellant. The captains of the boats claim they did have considerable trouble in getting them close to the wharf, and the evidence of some other witnesses tends to confirm their statements, but it is not pretended that the appellee was put to any additional expense thereby. When he complained to the appellant, he wrote to him what the city officials had informed him about dredging the dock, and offered to give him the use of a water front further down the dock to land large vessels on, free of extra charge, until the city completed the work. But the appellee abandoned the property and refused to pay the rent. Such conduct did not indicate any great desire on his part to abide by the terms of the contract, but rather betrayed some anxiety to get rid of it. Whilst those facts of themselves would not prevent his having relief, if he was otherwise entitled to it, it is proper in cases of this character for the Court to scrutinize carefully the acts and conduct of a party seeking to have a contract cancelled.

Being of the opinion that the evidence does not clearly and satisfactorily show that there was any misrepresentation made by the appellant, which induced the appellee to enter into the lease, we must reverse the decree of the Court below and dismiss the bill.

> *Decree reversed and bill dismissed*
> *with costs.*

(Decided April 1st, 1897).